DeVORE, P. J.
*1089 *472 Defendant appeals a judgment of conviction for third-degree assault of an emergency medical services provider, ORS 163.165(1)(g) (Count 1),[1] and second-degree criminal mischief, ORS 164.354(1)(b) (Count 2).[2] Among other things, defendant contends that the trial court should have entered a judgment of acquittal on Count 1 because the victim, an emergency room nurse, was not an "emergency medical services provider" within the meaning of ORS 163.165 (1)(g) and ORS 682.025(4). Defendant further contends that the trial court erred by excluding testimony pertaining to a possible mental disease or defect, which could be relevant under ORS 161.300 to the mens rea on each conviction.[3] On Count 1, we agree with defendant that the trial court should have granted the motion for a judgment of acquittal on the charge of third-degree assault. On Count 2, we agree with defendant that the trial court erred in excluding the testimony on the basis of improper notice under ORS 161.309(2). Accordingly, we reverse and remand as to Count 1 and Count 2 and otherwise affirm.[4]
The pertinent facts are undisputed. Defendant was a patient in a hospital emergency room because he had a dislocated arm. He did not leave when he was discharged. When the victim, an emergency room nurse, asked defendant to leave, he struck her in the head and caused injury. Afterward, defendant damaged an oxygen regulator in a *473 nearby patient room. The state charged defendant with third-degree assault and first-degree criminal mischief. A jury found defendant guilty of third-degree assault and second-degree mischief, ORS 164.354(1)(b) (a lesser included offense). We discuss, in turn, defendant's challenges to the convictions.
EMERGENCY MEDICAL SERVICES PROVIDER
At trial, defendant moved for a judgment of acquittal, arguing that the victim, an emergency room nurse, was not an "emergency medical services provider" (herein at times, "EMS provider") within the meaning of ORS 163.165(1)(g) and ORS 685.025(4)-a term added to the crime of third-degree assault in 1995. Or. Laws 1995, ch. 738, § 1. On appeal, defendant renews his argument. Because registered nurses like the victim are licensed under ORS chapter 678, defendant asserts that the regulation and licensure of EMS providers under ORS chapter 682 is inapplicable to them. Defendant *1090 further contends that the victim did not fit the definition of an EMS provider because she did not have statutorily referenced training in "prehospital care." The state disagrees and contends that, when the legislature amended the definition in 2011, the legislature intended to expand the definition's scope beyond emergency medical technicians and paramedics to include emergency room nurses. Because the denial of a motion for a judgment of acquittal "centers on the meaning of the statute defining the offense," we review the interpretation of the statute for legal error. State v. Hunt , 270 Or.App. 206, 210, 346 P.3d 1285 (2015) (internal quotation marks omitted).
The parties' arguments raise the question whether the legislature intended the term "emergency medical services provider" to apply to an emergency room nurse. In construing the meaning of a statute, we consider its text, context, and legislative history to discern legislative intent. State v. Gaines , 346 Or. 160, 171-72, 206 P.3d 1042 (2009).
As relevant here, ORS 163.165(1)(g) provides that a person commits third-degree assault if the person
"[i]ntentionally, knowingly or recklessly causes physical injury to an emergency medical services provider, as defined *474 in ORS 682.025, while the emergency medical services provider is performing official duties."
An "emergency medical services provider" means
"a person who has received formal training in prehospital and emergency care, and is licensed to attend any person who is ill or injured or who has a disability. Police officers, firefighters, funeral home employees and other persons serving in a dual capacity one of which meets the definition of 'emergency medical services provider' are 'emergency medical services providers' within the meaning of this chapter."
ORS 682.025(4).[5] We start with the text and context of the statute defining "emergency medical services provider."
At first blush, the text of ORS 682.025(4) appears broad enough to encompass an emergency room nurse, given its inclusion of "[p]olice officers, firefighters, funeral home employees and other persons serving in a dual capacity one of which meets the definition of 'emergency medical services provider.' " However, the context of the provision reveals that EMS providers and emergency room nurses are trained differently and meet different licensure requirements. See State v. Meek , 266 Or.App. 550, 556, 338 P.3d 767 (2014) ( "Text, however, cannot be viewed in isolation, but must, instead, be considered in the totality of the statutory framework."). That context suggests that the legislature did not intend for an emergency room nurse to come within the definition of "emergency medical services provider" on that basis alone.
ORS chapter 682-the chapter that contains the "emergency medical services provider" definition-begins by authorizing the types of rules that the Oregon Health Authority may adopt as necessary to carry out the functions of that ORS chapter. ORS 682.017. From the outset, that provision demonstrates that ORS chapter 682 is aimed at regulating emergency vehicles, EMS providers, and emergency care systems and dispatching aid. ORS chapter 682 *475 does not govern hospital emergency rooms or their personnel. The rules that the Oregon Health Authority may adopt include:
"(a) Requirements relating to the types and numbers of emergency vehicles, including supplies and equipment carried;
"(b) Requirements for the operation and coordination of ambulances and other emergency care systems;
"(c) Criteria for the use of two-way communications; and
"(d) Procedures for summoning and dispatching aid.
"(3) The authority shall adopt rules establishing levels of licensure for emergency medical services providers. The lowest level of emergency medical services provider *1091 licensure must be an emergency medical responder license."
ORS 682.017(2), (3). As written, that context, within which the definition of "emergency medical services provider" appears, reflects that ORS chapter 682 is concerned with the care provided before a patient reaches a hospital.
In other parts of ORS chapter 682, the legislature distinguished an EMS provider from an emergency room nurse. For example, ORS 682.039 provides that the Oregon Health Authority shall appoint a State Emergency Medical Services Committee composed of 18 members, including:
"(b) Four emergency medical services providers ***.
" * * * * *
"(g) One nurse who has served at least two years in the capacity of an emergency department nurse."[6]
The licensure requirements in ORS chapter 682 provide additional context for determining the meaning of "emergency medical services provider." One provision states that a "person may not act as an emergency medical services *476 provider unless the person is licensed under this chapter." ORS 682.204(1). The provisions that follow, ORS 682.204 to 682.218, provide specific licensing requirements for EMS providers, including an application for licensure that must be submitted to the Oregon Health Authority. The Oregon Health Authority is charged with "adopt[ing] rules establishing levels of licensure for emergency medical services providers." ORS 682.017(3).
The legislature included one exception from standard licensing of EMS providers, but it was not an exception for nurses. Called "licensure by indorsement," that exception provided:
"The Oregon Health Authority shall adopt rules to allow an applicant for licensure by indorsement as an emergency medical services provider to substitute experience and certification by a national registry of emergency medical services providers for education requirements imposed by the authority."
ORS 682.218. In its rules, the Oregon Health Authority considers certification by a national registry of emergency medical services providers. A rule provides: "A person registered with the National Registry as an EMR [emergency medical responder], EMT [emergency medical technician], AEMT [advanced emergency medical technician], or Paramedic may apply to the Authority for licensure by reciprocity." OAR 333-265-0050(1). Even that exception to the regular licensure for EMS providers applies only to first responders, paramedics, and EMTs.
By contrast, ORS chapter 678 governs nurses, who are licensed by the Oregon State Board of Nursing and who satisfy different licensure requirements than EMS providers. ORS 678.040. It is significant that different bodies regulate nurses and EMS providers. As we explain when discussing the legislative history below, the Oregon State Board of Medical Examiners formerly regulated certain levels of emergency medical technicians-the term the legislature previously used to refer to "emergency medical services providers." In 1989, however, the legislature directed the Oregon Health Authority to instead regulate all emergency medical technicians to foster greater consistency in *477 the field. Given the legislature's deliberate decision to designate the Oregon Health Authority as the body charged with regulating and licensing all emergency medical technicians-now referred to as EMS providers-it is unlikely that the legislature intended for nurses, governed by another body, to satisfy the licensure criteria for EMS providers.[7] *1092 Legislative history confirms our understanding that the legislature did not intend for an emergency room nurse to be included in the definition of an "emergency medical services provider." The history of the "emergency medical services provider" definition dates back to 1973, when the legislature referred to it as "emergency medical technician" (EMT). At that time, the legislature focused on requiring training for EMTs who helped a person at the scene of an accident and during transport by ambulance, before the person reached a hospital's emergency room.
The 1973 definition emerged from House Bill (HB) 2257 (1973), which had been referred to the House Committee on Human Resources. At a hearing, the committee heard testimony from professionals in the emergency medical services field. William McIntyre, Director of Emergency Medical Services of the State Health Division, offered his support for the bill and described the bill as follows:
"It provides for certification of emergency medical services technicians which allows us to certify as to this training * * * the training is very minimal training, it's a recommended 81 hour course * * * The second major part of the bill is the licensing of vehicles and regulations on the equipment * * *."
Testimony, House Committee on Human Resources, HB 2257, Mar. 27, 1973, Tape 17, Side 1 (statement of William McIntyre) (emphasis added). Dr. Paul Campbell, representing the Oregon Medical Association, testified:
"This is essentially a consumer bill *** to assure us that if we are injured or become sick, the individuals who *478 come to our aid will be properly qualified, properly trained * * * I think the people of Oregon deserve to have the individuals who come to their aid be properly trained, these people are truly professionals, they initiate the care at the scene, take care of the patient before they start moving the patient *** the physicians benefit because when the patient arrives to the hospital they've been properly cared for. "
Testimony, House Committee on Human Resources, HB 2257, Mar. 27, 1973, Tape 17, Side 1 (statement of Dr. Paul Campbell) (emphasis added). Dr. William A. Disher, a full-time emergency room physician, testified:
"As a full time emergency room physician, who is there greeting ambulances as they arrive * * * I think it is possible and practical to teach EMTs * * * so that there will be virtually no rural areas in Oregon without qualified EMTs."
Testimony, House Committee on Human Resources, HB 2257, Mar. 27, 1973, Tape 17, Side 1 (statement of Dr. William A. Disher) (emphasis added).
Ultimately, HB 2257 resulted in the definition of "emergency medical technician," among other provisions about regulating ambulances and their operators. The legislature defined "emergency medical technician" as:
"a person who attends any ill, injured or disabled person in connection with his transportation by ambulance. Policemen, firemen, funeral home employees and other personnel serving in a dual capacity one of which meets the definition of 'emergency medical technician' are 'emergency medical technicians' within the meaning of ORS 483.120, 483.121, 483.437, 485.500 to 485.595 and 485.992 ."[8]
Former ORS 485.500(3) (1973), renumbered as ORS 682.025 (1995) (emphases added).[9] That statutory definition accorded with the testimony before the House Committee on Human *479 Resources that regulation of "emergency *1093 medical technicians" applied to professionals responding at the scene of the accident-before the victim was transferred to a hospital emergency room and placed under the care of other medical professionals.
In 1989, the legislature made a significant change to the definition of "emergency medical technician," adding requirements of state certification and formal training in emergency care. The legislature defined "emergency medical technician" as:
"a person who has received formal training in emergency care, and is state certified to attend any ill, injured or disabled person. Policemen, firemen, funeral home employees and other personnel serving in a dual capacity one of which meets the definition of 'emergency medical technician' are 'emergency medical technicians' within the meaning of this chapter."
Former ORS 823.020(5) (1989), renumbered as ORS 682.025 (1995) (emphasis added).
The Oregon Board of Medical Examiners and Oregon Health Division jointly submitted the bill, Senate Bill (SB) 33 (1989), which included the amended definition. Their goal was to consolidate the coordination of emergency medical services under one agency, the Oregon Health Division. Previously, the Board of Medical Examiners regulated three EMT levels: "EMT II," "EMT III," and "EMT IV," and the Health Division regulated the "EMT I" level. During a hearing of the Senate Committee on Human Resources, Dr. Lester Wright, Deputy Administrator of the Department of Human Services Health Division, discussed the evolution of emergency medical services:
"I remember the times when many of the [ambulances] were operated by morticians, primarily because they were the only ones who had vehicles big enough to lie a stretcher down in the back. We've moved beyond that, we've moved beyond that to a system of emergency medical technicians trained to do specific tasks in the field that used to only be done by physicians and nurses ."
Testimony, Senate Committee on Human Resources, SB 33, Feb. 1, 1989, Tape 18 (statement of Dr. Lester Wright)
*480 (emphasis added).[10] At the same hearing, Senator Bill Kennemer, one of the members of the Committee on Human Resources, and Dr. Wright engaged in the following exchange:
"SENATOR KENNEMER: Dr. Wright, how many people will be involved under this kind of licensing, and I guess there are first responders and EMTs I, II, III, and IV, and there is also one other level, right?"
"DR. WRIGHT: The first responder is a different issue and I'd rather not *** but, yes, they will be continue to be licensed. There are currently about 4,300 EMT I's; 1,450 EMT II's; 400 EMT III's; and 750 EMT IV's. It is a large number of people."
Testimony, Senate Committee on Human Resources, SB 33, Feb. 1, 1989, Tape 18. The significance of that legislative history is twofold. First, Dr. Wright, the Deputy Administrator of one of the agencies that proposed SB 33, reaffirmed that EMTs perform their tasks in the field, rather than in an emergency room setting. Second, the exchange between Senator Kennemer and Dr. Wright confirmed that the licensing at issue specifically applied to EMTs, and not to other types of medical professionals, like emergency room nurses.
The next legislative development occurred when the legislature amended the third-degree assault statute to include assault of an EMT. In 1995, the Amalgamated Transit Union (ATU) sponsored an amendment to House Bill (HB) 2137 (1995), which added EMTs to the third-degree assault statute. Before the Senate Judiciary Committee, Ronald Heintzman, president of the union, testified:
*1094 "This bill is extremely important to EMTs in that they are the first responders and their primary job is to save lives.
*481 And when they respond to a situation like this, they have no way to protect themselves, their primary focus and concentration is on responding to the patient. When somebody attempts to assault them it takes their work away from the person they are trying to serve. So, we want to send a very clear message that when these people are out performing a life threatening saving job, anybody who attempts to distract or assault them will be dealt with harshly."
Testimony, Senate Committee on Judiciary, HB 2137, May 2, 1995, Tape 138, Side A (statement of Ronald Heintzman). That testimony reflects that the sponsor of the bill that first incorporated EMTs into the third-degree assault statute understood EMTs as first responders out in the field, rather than employees in hospital emergency rooms.
We return to the evolution of the statutory definition of ORS 682.025(4). We note that, in 2011, the legislature made two relevant changes with Senate Bill (SB) 234. First, the legislature changed the defined term to "emergency medical services provider," and, second, the legislature changed the phrase, "state certified to attend any ill, injured, or disabled person," to "licensed" to perform those tasks. The legislature amended the definition to read:
" 'Emergency medical services provider ' means a person who has received formal training in prehospital and emergency care, and is licensed to attend any person who is ill or injured or who has a disability. Police officers, firefighters, funeral home employees and other persons serving in a dual capacity one of which meets the definition of 'emergency medical services provider' are 'emergency medical services providers' within the meaning of this chapter."
ORS 682.025(4) (portion of amendments emphasized).[11] As we explain immediately below, the legislative history discloses that those changes were explicitly understood as effecting only a mere "technical fix" consonant with the legislature's historic and continuing focus on regulating and licensing EMT's specifically, without any substantive expansion of the definitional scope of ORS 682.025.
*482 The genesis of SB 234 was a national report card, which ranked Oregon 47th out of the 50 states in terms of delivery of emergency medical services, and graded Oregon a "D." Testimony, Senate Committee on Health Care, Subcommittee on Human Services and Rural Health Policy, SB 234, Mar. 28, 2011 (statement of Jim Andersen). SB 234 was offered to strengthen Oregon's emergency medical services and serve objectives that included a more regionalized system and coordinated communication. The legislature amended SB 234 and the definition of emergency medical technician. Senator Bates, who carried SB 234 in the Senate, discussed the amendment in the Joint Committee on Ways and Means. Senator Bates explained:
"SB 234 as amended is a technical fix to ensure emergency medical services technicians are consistent with the new national terminology *** Oregon's existing three levels of EMTs will stay the same and there will be one new level for veterans who were medics and passed the National Registry Exam. Oregon wants to align its EMT statute with national standards."
Testimony, Joint Committee on Ways and Means, SB 234, Jun. 20, 2011 (statement of Senator Bates) (emphasis added).
The characterization in legislative history of the 2011 amendment as a "technical fix" by the carrier of the bill conclusively contradicts the state's assertion that the legislature intended to broaden the substantive scope of the preexisting definition. Rather, as defendant argues, the amendment merely changed its terminology from "emergency medical technician" to "emergency medical services provider" and "state certified" to "licensed," in order to comport with national standards. Consequently, unless they have been duly certified under ORS chapter 682, emergency room nurses are not "emergency medical service providers" within the meaning of *1095 ORS 682.025 -and, derivatively, for purposes of ORS 163.165(1)(g).
Recent proposals to broaden the third-degree assault statute confirm what we have concluded is the narrower meaning of the definition of "emergency medical services provider." See State v. Cloutier , 351 Or. 68, 104, 261 P.3d 1234 (2011) (later legislative history "arguably confirms *483 what we have determined to be the amended meaning of [the statute] based on its text, context, and earlier enactment history"). In 2015, Senate Bill (SB) 132 (2015) was proposed and heard before the Senate Committee on Health Care. SB 132 would have expanded the third-degree assault statute by adding specific reference to hospital professionals immediately below the existing reference to EMS providers. In SB 132, third-degree assault was proposed to include:
"(h) Intentionally, knowingly or recklessly causes physical injury to a health care provider in a hospital , while the health care provider is performing official duties."
(Emphasis added.) SB 132 defined a "health care provider" as "a person who provides or assists in providing health care services in a hospital ."[12] (Emphasis added.) One witness at the hearing had served as a firefighter for 30 years and eight years as a worker in Salem Hospital's emergency room. He explained that firefighters and hospital workers deal with the same type of patients, but the employees are treated differently, for the purposes of assault, depending on where their workplace is. He testified that, when he was a firefighter-paramedic and was assaulted, the offense was a felony, but that it was not so when he was assaulted while working in the emergency room. He said, "I would just like to see that people in the emergency room department are treated the same as those on the street." Testimony, Senate Committee on Health Care, SB 132, Feb. 16, 2015 (statement of Ken Silveira). As it happened, SB 132 did not pass out of committee.
Similarly, House Bill (HB) 2620 was proposed in 2017, and, if passed, would have amended the third-degree assault statute to include assault of a "person working in a hospital." That bill, too, did not pass out of committee. Whatever may be the competing concerns in criminal law *484 and whatever may be the competing demands on the legislature, SB 132 and HB 2620 serve to demonstrate the language that the statute lacks and the language that may be added to expand the third-degree assault statute.
As matters stand today, the sum of text, context, and legislative history of ORS 682.025 (4) and ORS 163.165 (1)(g) indicate that the legislature did not intend to include an emergency room nurse within the definition and licensure of an "emergency medical services provider." For that reason, the trial court erred in denying defendant's motion for judgment of acquittal on Count 1.[13]
MENTAL DISEASE OR DEFECT
In his next assignment of error, defendant contends that the trial court erred in *1096 excluding testimony from his caseworker, Kelly, that was offered to suggest that defendant had a mental illness that could impair his ability to form the culpable mental state of the crimes with which he was charged. Before trial, a different judge held a hearing to determine the admissibility of Kelly's testimony under OEC 104. Defendant offered Kelly's testimony as lay testimony of defendant's behavior that was relevant to the mens rea element of the offenses. The judge ordered that "[n]o evidence of mental disease or defect under ORS 161.300 or .295 is allowed, as no notice was given and no report filed[.]" Later, the trial judge adhered to and adopted the pretrial judge's order. *485 Defendant challenges the pretrial and trial rulings excluding the evidence. Specifically, defendant contends that the trial court erred in excluding Kelly's testimony on the basis of the notice requirement under ORS 161.309(2), explained below. Defendant argues that the testimony was not subject to the notice requirement because it was not expert testimony, but instead was testimony from a lay witness. Defendant argues that the error was not harmless because "the court excluded evidence that tended to show that defendant suffered from a mental illness that could have impaired his ability to form the culpable mental states necessary to commit third-degree assault and second-degree criminal mischief."
We agree with defendant that the statute does not require notice of evidence of mental disease or defect from lay witnesses like Kelly. Generally, ORS 161.300 provides:
"Evidence that the actor suffered from a mental disease or defect is admissible whenever it is relevant to the issue of whether the actor did or did not have the intent which is an element of the crime."
In particular, the related notice requirement provides:
"The defendant may not introduce in the case in chief expert testimony regarding partial responsibility or diminished capacity under ORS 161.300 unless the defendant gives notice of intent to do so in the manner provided in subsection (3) of this section."
ORS 161.309(2) (emphasis added). As written, the statute only applies to the notice requirement for expert testimony. The Criminal Law Revision Commission, in commenting on what is now ORS 161.309, stated in pertinent part:
"Under the provisions of this section, the defendant without giving notice can introduce any lay evidence in an effort to show that he suffered from a mental disease or defect which rendered it impossible for him to form intent where such is required as an element of the offense with which he is charged. But if the defendant wishes to introduce the testimony of psychiatrists, psychologists or other expert witnesses, he must comply with the notice requirements of § 41.
*486 "The underlying reason for the notice requirements for this section (and for § 39, also) is to avoid surprising the prosecution with highly technical and complicated issues where experts are going to be used by the defense. The Commission concluded that it was sufficiently fair to the state that defendant put it on notice, in cases of partial responsibility as a defense, only when defendant intends to bring in experts in his case in chief."
Commentary to Criminal Law Revision Commission Proposed Oregon Criminal Code, Final Draft and Report § 40 (emphasis added). Similarly, our case law indicates that defendant does not have to provide notice of lay witnesses. See State v. Bozman , 145 Or.App. 66, 71, 929 P.2d 1019 (1996) ("Partial responsibility [another name for ORS 161.300 ] is not an affirmative defense, and a defendant need not provide pretrial notice of that defense unless the defendant intends to introduce expert testimony on that issue."). Consequently, the trial court erred in excluding Kelly's testimony on the ground that defendant had not provided notice under ORS 161.309(2).
The state does not confront the problem that the trial court erred in applying the notice requirement. We understand the state to make a "right for the wrong reason argument" that disputes the relevance of the proffered testimony. The state contends that the trial court properly excluded the testimony because it "did not show-absent additional *1097 evidence linking the observed behaviors to a mental disease or disorder-that defendant had a mental disease or disorder at all, much less a disease or disorder that affected his ability to form the charged mental states." The state argues that, to make testimony admissible under ORS 161.300, defendant would have needed to present expert testimony, which would have required notice. Finally, the state contends that any error in excluding the testimony would have been harmless because the testimony did not show that defendant suffered from a "mental disease or defect" or that his behavior impaired his ability to form the culpable mental states for the crimes.[14] *487 From our review of the record, we find nothing to indicate that the state asserted in the trial court the particular issues now raised on appeal. Because the record may have developed differently if those particular issues had been raised in the trial court, we do not exercise our discretion to determine if there is an alternative basis for affirmance. See Outdoor Media Dimensions, Inc. v. State of Oregon , 331 Or. 634, 659-60, 20 P.3d 180 (2001) (reviewing discretionary standards for review of new issues on appeal). Further, on the existing record, we cannot conclude that the error was harmless, because the excluded evidence implicates defendant's ability to form the mental states of the crimes with which he was charged.
In sum, the trial court erred in denying defendant's motion for a judgment of acquittal with regard to Count 1 charging third-degree assault, ORS 163.165(1)(g), and the court erred with regard to Count 2 charging criminal mischief, ORS 164.354(1)(b), in excluding lay evidence of mental disease or defect on the basis of notice required for expert testimony under ORS 161.309(2).
Convictions on Count 1 and Count 2 reversed and remanded; otherwise affirmed.

The statute provides that a person commits third-degree assault if the person "[i]ntentionally, knowingly or recklessly causes physical injury to an emergency medical services provider, as defined in ORS 682.025, while the emergency medical services provider is performing official duties."

The statute provides that a person commits criminal mischief in the second degree if "[h]aving no right to do so nor reasonable ground to believe that the person has such right, the person intentionally damages property of another, or, the person recklessly damages property of another in an amount exceeding $500."

Defendant raised an assignment of error relating to the trial court's failure to instruct the jury to decide whether defendant had a culpable mental state as to whether the victim was an emergency medical services provider. Our resolution of defendant's first assignment of error obviates the need to address that argument. Also, due to the disposition of the principal issues, we do not reach defendant's assignments of error regarding sentencing.

The state also charged defendant with attempted fourth-degree assault, ORS 161.405, and ORS 163.160 (Count 3), and public indecency, ORS 163.465 (Count 4). The jury found defendant not guilty on those counts.

Chapter 682 has been amended since defendant committed his crime; however, because those amendments do not affect our analysis, we refer to the current version of the statute in this opinion.

This provision dates back to the 1973 when the legislature referred to emergency medical services providers as "emergency medical technicians." Former ORS 485.570 (1973), renumbered as ORS 682.039 (2003). In 1973, the legislature included an emergency department nurse on what was then an advisory board, but not an emergency medical technician. Both were included on the committee by 1989. Former ORS 823.170 (1989), renumbered as ORS 682.039 (2003).

We reject the state's argument that the state proved, by sufficient evidence, that the emergency room nurse had met the licensing requirements of an "emergency medical services provider." The state did not introduce evidence that the nurse had met the specific licensing requirements for EMS providers in ORS 682.204 to 682.218. See ORS 682.204(1) ("A person may not act as an emergency medical services provider unless the person is licensed under this chapter.").

The italicized text identifies the portion of the text that is different from the current definition of "emergency medical services provider," ORS 682.025(4).

The session law that became ORS 485.500(3) was entitled, "AN ACT Relating to ambulance service[.]" Or. Laws 1973, ch. 407 § 1. That title suggests that the legislature's purpose in adopting the act was to regulate ambulances and the personnel that work in connection with ambulances. See Weldon v. Bd. of Lic. Pro. Counselors and Therapists , 353 Or. 85, 97 n. 13, 293 P.3d 1023 (2012) ("The title that offers interpretative assistance is that used by the drafters in the act's 'relating clause.' ").

On appeal, the state argues that "[t]he final sentence in [the statutory] definition-by making it clear that even funeral home employees can qualify as emergency medical services providers-reflects that the definition is no longer limited to EMTs and paramedics, and is not limited to those who encounter a person before the person enters a hospital." However, contrary to the state's argument, the statute's definition has included funeral home employees since 1973. Former ORS 485.500(3)(1973), renumbered as ORS 682.025 (1995). Dr. Wright's testimony provides a logical explanation as to why they were included from the beginning. Hence, we are not persuaded by the state's argument.

In 1997, the legislature added "prehospital care" to the definition of "emergency medical technician." ORS 682.025(6) (1997), amended by Or. Laws 2011, ch. 703, § 3.

The staff measure summary on SB 132 explained:
"Oregon law considers crimes against certain professions to be assault in the third degree: operators of public transit vehicles; staff members of youth correction facilities; emergency medical services providers; and operators of taxis. Hospital workers have a higher risk of violence in the workplace than other professions."
Staff Measure Summary, Senate Committee on Health Care, SB132A.

The state suggests, that, in the event we reverse on Count 1, the appropriate remedy would be to remand for entry of a judgment of conviction for fourth-degree assault. As we will explain next, the court also committed evidentiary error that affected the trial of the facts that would support a conviction of the lesser-included offense, so the state's proposed remedy is not appropriate in this case. However, the record before the trial court at the time of the motion for a judgment of acquittal was sufficient to support a conviction for fourth-degree assault, and, if the court had been inclined to grant defendant's motion, then the state could have requested that the court nonetheless send the lesser-included charge to the jury. Our opinion does not foreclose the possibility of a retrial on the lesser-included charge of fourth-degree assault, and we leave it to the parties on remand to address any potential issues, such as double jeopardy or due process, that might arise in that posture. Cf. State v. Burgess , 240 Or.App. 641, 654, 251 P.3d 765 (2011), aff'd , 352 Or. 499, 287 P.3d 1093 (2012) (rejecting the view that the defendant was entitled to an "unqualified judgment of acquittal" and remanding for retrial on a lesser-included offense).

See, e.g. , State v. Wright , 284 Or.App. 641, 648, 393 P.3d 1192 (2017) (lay testimony, without more offered, lacked nexus to make intellectual disability relevant to culpable mental state); see also State v. Shields , 289 Or.App. 44, 53, 407 P.3d 940 (2017) (testimony failed to establish an evidentiary link between diagnosis and defendant's conduct so as to justify jury instruction on the guilty except for insanity defense, ORS 161.295 ).